UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>v.<br><br>CHRISTOPHER CORREA,<br>    Defendant. | Case No. 4:15-679<br><br>Redacted version unsealed<br>1-25-2017 |

### Sealed Responses to Defendant's PSR Objections

The United States asks that, except for a few minor factual corrections, defendant's PSR objections (Dkt #41) be overruled.

**A. The United States does not contest most of defendant's objections to minor facts**

Because most of defendant's objections (paras. ▉▉▉▉) are minor factual corrections that, if true, still do not affect the Guidelines calculations, the United States does not object to them.

**B. The 2 level enhancement for accessing "personal information" applies because defendant accessed medical records (Def. Obj. para. 7)**

Correa objects to PSR ¶▉ claiming no "personal information" was viewed. However, Correa accessed private medical records that the Astros had gathered, which do constitute "personal information." U.S.S.G. § 2B1.1(b)(17), App. Note 1. For example, Correa viewed medical pages for 1B/DH/LF Conrad Gregor (Player L, drafted by the Astros in the 4th round in 2013) and 1B Chase McDonald (Player N, also drafted by the Astros that year).

1

Correa also accessed the medical page of pitcher Marco Gonzales (Player A). On April 2, 2013, Correa accessed Gonzales' medical page, but no records were available at that moment.[1] The next day, on April 3rd, Correa checked again, saw that the Astros had by then uploaded Gonzales' medical information, and viewed them. (Correa continued to monitor pitcher Marco Gonzales by again viewing the Astros' information on April 8th and 15th.) Two months later, the Cardinals selected Gonzales as their 1st round pick in the June 2013 Amateur Draft. Thus, this enhancement should apply, and Correa's sentence is correctly calculated in PSR ¶¶ ██ and ██.[2]

### C. Correa's intrusions are not "clearly aberrant" (Def. Objs. para. 19 to 21)

It is possible that one intrusion could be an aberration. But 50+ intrusions over 16 months is not an aberration. Nor are intrusions into 5 different Astros employees' accounts an aberration. This objection should be overruled.

### D. The victim's conduct did not contribute to the offense (Def. Objs. para. 22 to 26)

#### (1) The network logs squarely contradict Correa's claims

Defendant argues that he intruded into the Astros' computers to see if the Astros took proprietary information – but his claims are contradicted by the network logs which show that the Ground Control pages he viewed were completely unrelated to his claims.

- As the June 2013 Amateur Draft approached, Correa studied players whom the Astros were thinking of drafting. ████

- During the June 2013 Amateur Draft, Correa viewed players who had not yet been drafted, and whom the Astros were considering. ████

---

[1] That said, Correa also viewed (i) notes of Astros scouts' observations when they watched Gonzales pitch, (ii) the bonus that Astros scouts recommended be paid to Gonzales, an indication of how highly the Astros were interested in Gonzales, and (iii) evaluations by Astros scouts about Gonzales' ceiling and how confident they were of his ability to achieve those goals.

[2] Alternatively, "personal information" also includes "private correspondence, including e-mail." U.S.S.G. § 2B1.1 App. Note 1. Correa enjoyed unfettered access to Sig Mejdal's (Victim A) Astros e-mail account which contained considerable amounts of private correspondence with his wife, friends, and industry colleagues.

*This information could not possibly help him determine if the Astros took information.*

Correa's claim is especially contradicted by the fact that he was reading the Astros' notes of their trade discussions with other teams – again, topics that could not possibly help him determine if the Astros supposedly took Cardinals information.

- As the July 31st Trade Deadline approached, he studied the Astros' trade notes at least 14 times to see who they – and other teams – were thinking of trading, and what the offers were, information that would help gauge market price. ███

- As the autumn GM Meetings and Winter Meetings approached, he again studied the Astros' trade notes to see who they and other teams were thinking of trading. ███

Ultimately, Correa was not intruding to see if the Astros took any information – rather, he was keenly focused on information that coincided with the work he was doing for the Cardinals.

### (2) June 5, 2013:  the day before the 2013 Amateur Draft

A few in-depth examples also confirm that Correa's intrusions were not for the purpose of investigating whether the Astros somehow took any Cardinals information.

On June 5, 2013, the day before the draft, at 6:24 am, Correa intruded into Ground Control, and immediately navigated to the Astros' draft page, sorting it by performance score to see the prospects whom the Astros rated the highest.

Correa also navigated to the Astros' main page for the Cardinals, then to the team rosters page.  He also viewed the Astros main scouting page, their scouts' weekly digest page, their main pro scout page, their task page of their analytics department which listed their work plan for what tasks they had on their docket.  He also viewed the Astros' notes for the Cardinals, which featured the Astros' perspective of their trade discussions with the Cardinals.

### (3) June 8, 2013: Day 3 of the 2013 Amateur Draft

On June 8th, at 6:43 am before Day 3 of the Draft, Correa again accessed Ground Control, and immediately navigated to the Astros' Draft page. He then clicked onward to page 2 of their Draft page (each page only displayed 40 players), presumably because the first 40 players had already been selected on Days 1 & 2. He then filtered the draft page to only show players who were still available. He viewed the Astros' draft pages for college pitchers and college hitters after sorting them by the performance score that the Astros gave them. He also viewed the Astros' information for 3B Adam Nelubowich (Player G), whom the Astros drafted later that day, and 2B/3B/DH Erich Weiss (Player H), whom the Pittsburgh Pirates drafted that day.

The bottom line is that Correa was not conducting an investigation into the Astros in the middle of the 2013 Draft.

### E. Correa cannot argue that the Astros information he viewed was "not used for competitive advantage" (Def. Objs. para. 31 to 33)

As teams prepared for the June 2013 Amateur Draft, Correa studied players whom the Cardinals were thinking of drafting.

### (1) April 3, 2013: Correa viewed information about high-level scouting, Marco Gonzales, Brandon Trinkwon

On April 3rd, Correa accessed Ground Control, and immediately navigated to the Astros' PrefList, which showed the players whom the Astros were considering drafting, ranked in the order in which the Astros most wanted them. He then accessed the scouting observations of Mike Elias (Director of Amateur Scouting), David Post (National Cross-checker), and Brian St. Pierre (North-East regional scout). Correa also checked the Astros' latest scouting information for pitcher Marco Gonzales, who became the Cardinals 1st round draft pick.

Correa also accessed the Astros' information on SS Brandon Trinkwon (Player B), including his hitting report and the Astros' impressions about his defensive skills and mental makeup. Two months later, Trinkwon was drafted by the Dodgers in the 7th round (214th overall pick), right before the Cardinals selected a different shortstop with the 215th overall pick.

### (2) April 30, 2013: Hunter Dozier

On April 30, 2013, Correa was intensely interested in 3B Hunter Dozier (Player E). That morning, Cardinals logs show that Correa and his colleagues had searched for Dozier that day in their own Cardinals database: Correa searched at 6:12 am, 9:02 am, and 9:06 am. One of his analysts searched at 9:05 am. Then his Scouting Director searched for Dozier at 11:38 am. Correa again searched at 11:43 am.

A few minutes later, at 11:49 am, Correa intruded into Ground Control, and immediately navigated to the Astros' 2013 draft page. At 11:58 am, he navigated to the Astros' draft page for Hunter Dozier. He also viewed hitting reports by Director of Amateur Scouting Mike Elias, and regional scout Gonzales on Dozier, and the trend of bonuses that Astros scouts had been recommending that Dozier be offered.

### F. Defendant cannot argue that he received no personal benefit from the information he illicitly viewed (Def. Objs. paras. 27 to 30)

As defendant implicitly concedes, U.S.S.G. § 2B1.1 relies on loss to a victim, not the benefit gained by the defendant. As a PSR objection, defendant's argument is simply a red herring. Further, as described in the Sentencing Memorandum, Correa's actions caused heartache and embarrassment for the Astros.

That said, 50+ intrusions into Ground Control – and unfettered access to Sig Mejdal's (Victim A) Astros e-mail account – provided Correa with significant benefits. Correa viewed the Astros' information from at least March 24, 2013 to June 28, 2014. About 5 months later, on

December 2, 2014, he was promoted to Director of Scouting, where he would oversee the Cardinals' scouting department and the amateur draft. These two areas – scouting and the draft – were areas Correa focused on when he intruded into the Astros' computers.

While any promotion is due to a combination of factors, the Court can infer that Correa built his track record of accomplishment partly on the insights he gained from accessing the Astros' information.

Converting minor league athletes into Major League Baseball players takes an enormous investment in time, coaching, and money. Rookie league, Class A, Class A-Advanced, Double-A, Triple-A – once drafted, a player must ascend a ladder of development that usually spans years before being invited to the Major Leagues. Players drafted in 2013 are only now beginning to sniff the big leagues. Many players never make it. To avoid wasting these investments, more and more resources are poured into deciding which players to acquire.

If Correa did, in fact, keep his intrusions a secret from his colleagues, his access to the Astros' information was still invaluable. Before he proposed an idea, he could quietly check what another analytics-minded organization thought. He could also supplement his own ideas with the ideas of the Astros' analytics department because he knew what projects the Astros' analytics department was researching, what concepts they found promising, what ideas they had discarded. He had access to everything that Sig Mejdal, the head of the Astros' analytics team, read and wrote via e-mail. Correa's ability to corroborate his judgment calls with his secret access must have been invaluable, particularly for someone who sought to impress his superiors. Thus, even if defendant did not tell his colleagues the source of his insights, his career nonetheless benefited in other, subtler ways.

### G. The negotiations were not one-sided (Def. Objs. paras. 38 to 47)

When defendant intruded into Ground Control, he exposed himself to being charged with aggravated identity theft, which carries a two-year term of imprisonment. Ultimately, if the bargaining power was "grossly unequal," it is only because of defendant's own misconduct.

But it was not "grossly unequal." Defendant's attorney is one of the most respected attorneys in the city. It is a testament partly to his negotiating skill that the United States opted against charging defendant with aggravated identity theft. As the Court confirmed at the rearraignment hearing, the plea agreement was the product of extended negotiations between the parties, both of whom made concessions over several months. This is not a case where the negotiations were one-sided. Instead, the parties agreed that a more restrained sentence was appropriate, so they agreed on the loss calculations and the sophisticated means enhancement, and to not charge aggravated identity theft.

Having made his bargain, defendant should not be allowed to now complain about its terms. He should not be able to have his cake and eat it too.

### H. The Court should not downwardly depart or vary (Def. Objs. para. 48 to 50)

Defendant asks the Court to downwardly depart or vary, because he is a "first offender." But 50+ intrusions over 16 months cannot be considered a "first-time." This is merely the first time he was caught.

Moreover, tracking down a crime over the internet – particularly someone who is actively masking their identity and location – is not easy. It takes a lot of time and detective work to reconstruct what happened and who did it. It also requires technological skills, a scarce commodity even among FBI agents. Also, internet crimes are increasingly common.

To be clear: the United States is <u>not</u> asking that defendant receive an above-Guidelines sentence. But if the Court were to downwardly vary or depart, this would further embolden hackers and other computer criminals whose crimes are increasingly consuming scarce law enforcement resources. Thus, the United States asks the Court to consider the need to deter others, and overrule defendant's objections.

      Respectfully submitted,

      KENNETH MAGIDSON
      UNITED STATES ATTORNEY

      _____/s/_____
      Michael Chu
      Assistant U.S. Attorney